IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Cheryl Hill, | : | |
| Plaintiff, | | Civil Action 2:12-cv-0268 |
| | : | |
| v. | | Judge Sargus |
| | : | |
| Carolyn W. Colvin, | | Magistrate Judge Abel |
| Commissioner of Social Security, | : | |
| Defendant. | | |
| | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Cheryl Hill brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying her application for Social Security Disability Insurance Benefits. This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.** Plaintiff Cheryl Hill maintains that she became disabled on February 15, 2007, at age 49, due to bipolar disorder. (*PageID* 204.) The administrative law judge found that Hill had an unrestricted physical ability to work but needs a static environment, with few changes in routine. She can perform repetitive tasks but cannot have strict time/production standards. Her work cannot involve more than superficial contact with others. Finally, she cannot maintain attention/concentration for more than two hours at one time. Given these restrictions, the vocational expert testified that there were more than 35,000 jobs in the local economy Hill could perform.

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because:

- The administrative law judge gave improper weight to the medical opinions.

- The administrative law judge's residual functional capacity is not supported by substantial evidence because the question posed to the vocational expert was improper.

**Procedural History.**  Plaintiff Hill protectively filed her application for disability insurance benefits on December 5, 2007, alleging that she been disabled since February 15, 2007.  (*PageID* 185-87.)  The application was denied initially and upon reconsideration.  (*PageID* 125-26, 128-29, 136-37.)  Plaintiff sought a *de novo* hearing before an administrative law judge.  (*PageID* 140-41.)  On June 11, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (*PageID* 90-114, 117-18.)  A vocational expert also testified. (*PageID* 114-22.)  On September 28, 2010, the administrative law judge issued a decision finding that Hill was not disabled within the meaning of the Act.  (*PageID* 49–60.)  On February 3, 2012, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (*PageID* 34-38.)

**Age, Education, and Work Experience.** Plaintiff Hill was born in 1957 and was 49 years old on the alleged disability onset date.  (*PageID* 193.)  She has a high school education.  (*PageID* 209.)  She has past relevant work experience as a owner/sales

person in a gun store (retail store manager), jewelry sales person, waitress/bartender, and an assembler of motor vehicles.  (*PageID* 115-16, 205.)

**Plaintiff's Testimony.** The administrative law judge summarized Hill's testimony as follows:

> The claimant testified that she can perform various chores "if she feels up to it."  She likes doing yard work although she will not go out [i]f her neighbors are around.  She goes shopping with her daughter, tries to read, and reported going to the library on one occasion to use a computer.

(*PageID* 53.)

> The claimant testified that she has had a lot of stress in her life.  She acknowledged overdosing on medications and smoking marijuana.  She stated that she has trouble with bipolar disorder, with symptoms including deep depression.  The claimant reported hiding in her room. She likes to read but struggles with reading.  She has trouble sleeping and does not close her eyes.  The claimant stated that she has gone three days without sleeping.  She has crying spells every week and hides in her bed.

> The claimant further alleged that she is afraid to talk to people and has been unable to do grocery shopping.  Her daughter has to help her do the grocery shopping.  She will not go out when her neighbors are out because she does not want to talk to them.  The claimant also stated that she has trouble concentrating and cannot get through things.  She feels she is unable to do any kind of work.

(*PageID* 55.)

**Vocational Expert's Testimony.**  The administrative law judge proposed a series of hypotheticals regarding plaintiff's residual functional capacity to the vocational expert.  The administrative law judge asked the vocational expert to consider an individual with plaintiff's vocational characteristics who had no physical or exertional limitations, but was able to work in a static environment characterized by few changes

in routine, performing repetitive tasks, and work that did not require more that superficial contact with others. (*PageID* 117.) The work cannot involve strict time/production standards. Plaintiff also cannot maintain attention/concentration for more than two hours at one time. (*PageID* 118.)

Based on the above hypotheticals, the vocational expert acknowledged that plaintiff could not perform her past relevant work, but that such an individual could perform work as a housekeeper/cleaner, with 7,448 jobs in the regional economy; dishwasher, with 3,612 jobs in the regional economy; and stock and freight handler, with 25,939 jobs in the regional economy. (*PageID* 118.)

When asked about the limitations addressed in Dr. Corner's assessment, the vocational expert testified that such an individual would not be able to engage in competitive work. (*PageID* 119-20.)

When cross-examined by plaintiff's counsel, the vocational expert was asked about the limitations addressed in Ms. Davidson's assessment; the vocational expert testified her opinion does not allow for ability to sustain competitive work. (*PageID* 121.)

**Medical Evidence of Record.** The relevant medical evidence of record is summarized as follows:

Licking Memorial Hospital. Plaintiff presented to the emergency room on January 17, 1998 for an overdose. (*PageID* 276-96.) Upon arrival she was alert and oriented and stated this was a suicide attempt. (*PageID* 279.) Plaintiff reported she was

4

depressed and a recovering alcoholic, who had previously also been dependent on drugs.  She was seeing Dr. Linda Cole and has been on medication, including Prozac, Effexor, Depakote, and Trazodone.  She apparently ingested quite a bit of Depakote.  In the emergency room she was given charcoal.  She was admitted for further treatment and evaluation.  (*PageID* 277.)

      <u>Linda Cole, M.D.</u>  Plaintiff treated with Dr. Cole from February 1997 until July 2003.  (*PageID* 297-365.)  Dr. Cole's progress notes show a history of bipolar disorder and alcohol dependence.  Plaintiff's mood cycled between depressed (*PageID* 300, 305, 307, 314, 318-20, 327, 331, 356, 359), normal (*PageID* 301-03, 308), and manic.  (*PageID* 310, 321-22.)  In July 2002, Dr. Cole noted that Hill's affect was stable and she had normal range and intensity.  Plaintiff's mood was euthymic with little in the way of affective outbursts and her neurovegetative symptoms were lacking.  Dr. Cole assessed that the current combination of medication along with plaintiff's nutritional supplementation and diet/exercise sleep pattern was keeping her remarkably stable. (*PageID* 309.)

      <u>Christopher J. Corner, M.D.</u>  Dr. Corner, a psychiatrist at Hocking Hills Family Counseling and Psychiatry, began treating plaintiff for her bipolar disorder on August 2006.  Plaintiff initially reported that she has had a mood disorder for the past 20 years. (*PageID* 376 and 445.)  Hill saw Dr. Corner 15 times between August 2006 and April 2008.  (*PageID* 372-76 and 438-45.)  Dr. Corner diagnosed plaintiff with bipolar I disorder.  (*Id.*)  On October 31, 2006, Dr. Corner reported that plaintiff's mood was

depressed.  (*PageID* 444.)  Between April 2007 and January 2008, treatment notes show

that plaintiff was doing well, tolerating her medication, and had no abnormalities.

(*PageID* 372-73.)  Treatment notes from January, April, May, August and November

2007, all say that "the patient" was "doing OK." (*PageID* 442-43.) On January 14, 2008,

the treatment notes again state that Hill was "doing OK." On April 7, 2008, Dr. Corner

mentioned that Hill's use of alcohol had increased.[1]  (*PageID* 441.)

On November 6, 2007, Dr. Corner completed a Mental Functional Capacity

Assessment of plaintiff for the Ohio Department of Job and Family Services.  (*PageID*

446-48.)  He  reported that Hill suffered from bipolar affective disorder. He said her

mood swings were severe and disabling. (*PageID 446.*) On the part of the form asking

for his mental status examination of Hill, Dr. Corner wrote that she was well-oriented.

Her mood and affect were stable and euthymic. There was no suicidal ideation. Her

thought content centered on loss. She demonstrated poor focus and concentration.

There was some irritability. (*PageID 448.*)

Dr. Corner concluded that plaintiff was moderately limited in her abilities to:

remember locations and work-like procedures; understand and remember very short

and simple instructions; understand and remember detailed instructions; carry out very

short and simple instructions; carry out detailed instructions; sustain an ordinary

routine without special supervision; make simple work-related decisions; maintain

---

[1]She was hospitalized June 24, 2008 following a drug overdose suicide attempt.
(*PageID* 450-99.)

socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (*Id.*)  Dr. Corner found plaintiff was markedly limited in her abilities to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; and accept instructions and respond appropriately to criticism from supervisors.  (*Id.*)  Dr. Corner concluded that plaintiff's limitations would be expected to last 12 months or more.  (*Id.*)

Fairfield Medical Center.  For three days in August 2007, Hill was hospitalized for pneumonia.  (*PageID* 415-32.)  Dr. Raya recommended she quit smoking and started her on IV antibiotics, nebulizers, and oxygen.  (*PageID* 419.)  Since Hill was an alcoholic, she was placed on DT (delirium tremens) precautions.  Her discharge diagnoses were right upper lobe pneumonia, Hilar adenopathy, chest pain as a result of pneumonia, and bipolar disorder.  (*PageID* 415.)

Plaintiff was hospitalized on June 24, 2008 following a drug overdose in a suicide attempt.  (*PageID* 450-99.)  It was suspected that she overdosed with Seroquel and

lithium, although marijuana and alcohol were also found in the room. (*PageID* 455.) Plaintiff spent several days on a ventilator. She was discharged on July 2, 2008, at which time she was told that she needed to stop marijuana and alcohol. (*PageID* 456.)

On January 22, 2009, Hill was admitted to the ICU after overdosing on multiple antidepressant medications including Eskalith, Neurontin, Seroquel, and Lexapro. (*PageID* 533-67.) Due to concerns about lethality, plaintiff was transferred to the Psychiatric Unit. She was placed on medications and, as her hospitalization progressed, she improved. (*PageID* 561.) Her discharge diagnoses included an adjustment disorder, history of substance abuse, bipolar disorder, personality disorder versus personality traits and , status post overdose. They also noted this suicide attempt followed a period of family conflict including a relapse into alcohol use, stress between herself and her daughter, financial stressors, and applying for disability. (*Id.*) She was to follow up with Dr. Wood at Six County, Inc. (*PageID* 562.)

<u>Neel Raya, M.D.</u> Dr. Raya first saw plaintiff in his office on December 10, 2007. (*PageID* 434.) That same day, Dr. Raya completed a Basic Medical form on behalf of the Ohio Department of Job & Family Services. (*PageID* 435-36.) Dr. Raya listed Hill's diagnoses as depression and bipolar disorder. Dr. Raya noted that her health status was deteriorating. (*Id.*) Based on his observations, Dr. Raya opined that plaintiff could not keep her attention or work based on mental issues which were not well controlled due to her inability to get medications. (*Id.*)

8

<u>Charles Loomis.</u>  Plaintiff Hill was evaluated by Mr. Loomis on March 12, 2008 on behalf of the Bureau of Disability Determination.  (*PageID* 379-85.)  Hill reported that she had been divorced four times, and at the time of the evaluation she was in a physically abusive relationship.  She related generally getting along well with others but stated that she had recent difficulty dealing with coworkers and supervisors.  She also reported drinking on the job.  She gave a history of drinking daily, frequently becoming intoxicated, and smoking cannabis on a daily basis.  A large bottle of vodka lasted her 4-5 days. She drank a bottle of wine that morning. (*PageID* 380-81.)  She said she was unable to work because she had difficulty getting along with people. (*PageID* 583.) Hill performed her own household chores, errands, lawn care, and gardening. She drove an automobile and visited with her stepfather, daughter, and grandmother. She liked to listen to music and read. She went out to eat frequently. (*PageID* 583.)

Mr. Loomis noted that Hill presented with moderate symptoms of depression. She showed no motor signs of anxiety but did report that she often felt as if she were out of control and reported a lifestyle that was suggestive to the examiner of self-destructive behavior.  Plaintiff evidenced no abnormalities of mental content.  Her functional intelligence appeared to be in the high average range.  (*PageID* 383-84.)

Mr. Loomis diagnosed alcohol dependence, cannabis abuse, and bipolar disorder.  (*PageID* 384.)  He assigned Hill a Global Assessment of Functioning (GAF) score of 55.  (*Id.*)  He opined that her mental ability to relate to others was moderately impaired.  Her ability to understand, remember, and follow complex instructions was

9

not impaired.  Her ability to maintain attention and concentration to task was well above average.  Her ability to cope with the ordinary stresses and pressures of competitive work was moderately impaired.  (*PageID* 384-85.)

Tonnie Hoyle, Ph. D.  On April 30, 2008, Dr. Hoyle, a state agency psychologist, completed a mental residual functional capacity assessment and a psychiatric review technique.  (*PageID* 387-404.)  Dr. Hoyle stated that Hill's medically determinable impairment was bipolar disorder. (*PageID 394*.) She also suffered from substance addiction disorders. (*PageID 391*.) She found plaintiff was moderately limited in maintaining social functioning and maintaining concentration, persistence, and pace. Plaintiff was mildly limited in her activities of daily living with no episodes of decompensation.  (*PageID* 401.)

Dr. Hoyle opined that plaintiff was moderately limited in her abilities to: work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral  extremes; maintain socially appropriate behavior; and adhere basic standards of neatness and cleanliness. (*PageID* 387-88.)

Dr. Hoyle noted that her review of the record shows that plaintiff's activities of daily living were fairly intact and she was partially credible.  (*PageID* 389.) Dr. Hoyle gave weight to Mr. Loomis' conclusions and she concluded that plaintiff was capable of performing repetitive tasks in an environment that was relatively static and required only brief and superficial contact with others.   (*Id.*)

In making her assessment, Dr. Hoyle relied primarily on Dr. Loomis's examination. (*PageID 389.*) She said that the current treating source did not address areas of function, that "[h]is notes from 1/4/07 to 4/17/07 simply say 'doing OK.'" (*Id.*) Relying on Dr. Loomis's report, Dr. Hoyle states that Hill's activities of daily living are fairly intact because she can maintain house, drive, shop, cook, clean, frequently go out to dinner, and visit her family regularly. She concluded that plaintiff was "capable of performing repetitive tasks in an environment that is relatively static and requires only brief superficial contact with others." (*Id.*)

On October 23, 2008, Dr. Kristen Haskins, a psychologist, wrote: "I have reviewed all the evidence in the file and the assessment of 4-30-2008 is affirmed as written." There was no further discussion. (*PageID 405.*)

Six County, Inc./Wheaton B. Wood, M.D./Kathleen Davidson, P-CC.  Plaintiff returned to treatment at Six County, Inc. following her suicide attempt in July 2008. (*PageID* 569-80.)[2]  The intake assessment states that this was her third suicide attempt.

---

[2]On June 7, 2005, Plaintiff attended a diagnostic assessment at Six County, Inc. but never returned for treatment. (*PageID* 366-68.)

(*PageID 596.*) Initially, she was assessed by a therapist, Ms. Davidson, who diagnosed Hill with bipolar disorder - depressed and poly-substance dependence.  (*PageID* 578.) Hill had used marijuana since age 15, alcohol since age 17, and narcotic pain pills since age 18. (*PageID* 573.) She had an 18-year history of poly-substance dependence. Hill had in-patient drug aftercare treatment at Shepherd Hill in 1997. (*Id.*) She  reported a 20 year history of bipolar disorder. Her functioning had been declining for a year and a half. She had increasing difficulty caring for herself and keeping a job. (*PageID* 577.)  She did not want to attempt suicide again. Her goal was to be fear free and happy. (*PageID* 576.) Treatment goals were to improve mood stability and manage symptoms, connect with community resources, and improve activities of daily living and functioning for employment. (*PageID* 578.)

Hill attended bi-weekly individual counseling sessions with Ms. Davidson. (*PageID* 583-621.)  Dr. Wood also examined plaintiff and managed her medications. (*PageID* 581-82, 622-47.)  Plaintiff also received services through a community support specialists. (*PageID* 649-54.)

Dr. Wood's July 25, 2008 office notes state that at age 30 Hill had the onset of significant depression following childbirth. Her first mania was at age 31. Her depression has been fairly unremitting, with bouts of mania about every two years. The bipolar disease was complicated by poly-substance abuse (primarily alcohol, marijuana, and many different kinds of pills) and alcohol abuse. She had been in several drug treatment programs. Although she had attended AA in the past, she was not then

12

attending "for somewhat spurious reasons." (*PageID* 607.) At that time, Hill had been sober for 30 days. (*Id.*)

Dr. Wood's office notes for February 6, 2009 state Hill had been hospitalized for a suicide attempt. The plan was to dispense no more than seven days of medications at a time. Two pistols were to be taken by her father for safe keeping. Dr. Wood was to see Hill every four weeks, and a therapist would also see her. Hill was instructed to make appointments as seemed advisable to her. (*PageID* 636.)

On examination, Hill's mood was angry and her affect was congruent and somewhat labile. Her mentation was logical on the surface, but also illogical. Her mentation had a "gamey quality . . . [of the] classic borderline bipolar substance abuser which is so lethal when the alcohol is added in." (*Id.*) This was her second suicide attempt since beginning treatment at Six County. She was "also a little bit manic with some pressured speech but just a little bit . . . ." (*Id.*) She was separating from her abusive boyfriend which was very painful. (*Id.*)

Hill  was not interested in taking any medicine that would stop her from drinking and was resistant to attending AA meetings. Dr. Wood believed Hill had "to come to grips with the fact that she is very ill whether it is mostly bipolar or mostly borderline and mostly alcohol doesn't matter." (*PageID* 637.) She has "a potentially very fatal illness," but Dr. Wood told her they were going to do everything they could to prevent her from dying. (*Id.*)

On examination, Hill's mood and affect were depressed. Dr. Wood said she had "thoughts of wishing she is dead but is passive and does not have active suicidal orientation at this time." (*PageID* 607-08.) Her attention and concentration were excellent when performing serial sevens forward and backward. (*PageID* 608.)

Dr. Wood's office notes for March 6, 2009 state that the diagnoses were "[b]orderline with  bipolar, currently euthymic and tendency toward polysubstance dependence especially with alcohol." (*PageID* 634.) She said she had no suicidal ideation. She had a "wonderful time in Texas with her mother." (*Id.*) She took her three year old grandson with her on the trip. She was concerned that she would lose her house because she could not pay the mortgage. Hill said her boyfriend was stalking her. (*Id.*)

On examination, Hill was euthymic. Her affect was congruent and pleasant. She reported frightening nightmares. She was not suicidal. (*Id.*)

On March 13, 2009, Dr. Wood reported that plaintiff suffers from Bipolar disorder superimposed on Borderline Personality disorder with poly-substance dependence, including alcohol.  At that time, he felt plaintiff's poly-substance dependence was under control and had been for more than a year.  He also reported that in the last two months plaintiff has been disabled from work because of a significant worsening of her bipolar disorder.  He concluded that she "probably has been disabled from work for about three years."  (*PageID* 412.)

Dr. Wood's office notes form April 8, 2009 state that Hill suffered from severe bipolar depression superimposed on an unspecified personality disorder. She was "really miserable" and had been crying a lot. Her sleep was not restful and was insufficient. She reported difficulty reading a simple magazine article. Dr. Wood told her to write a 50 word or less summary of one magazine article every week to see if she would benefit from cognitive enhancement therapy. Dr. Wood believe it was critical to get her into ECT but she did not have insurance. (*PageID* 632.)

On May 4, 2009, Dr. Wood's office notes state that Hill suffered from severe bipolar depression "which has been disabling and cognitively disabling as well as underlying Alcohol Dependence, active and Personality Disorder (NOS)." (*PageID* 630.) She was a severe suicide risk. Guns had been removed from the home. She got a medications box every two weeks. She saw Dr. Wood once every four weeks and the therapist frequently. (*Id.*)

On examination, Hill's mood was moderately depressed, which was "an enormous step forward." (*Id.*) Her affect was congruent and reactive. Naltrexone was prescribed to help reduce drinking. (*Id.*)

On May 29, 2009, Hill was "pleasant and positive, cooperative with her" case worker. She felt good about herself and the relationship she was in. She "looked great, and [had a] great/good mood." (*PageID* 653.)

Dr. Wood's notes from the May 29 visit state that Hill had "devastating Bipolar Depression in a formerly high functioning woman, and Alcohol Dependence in early

15

full remission." (*PageID* 628.) Her chief complaint was anxiety about decreasing the Seroquel. She had not had a drink for 28 days and was not really craving alcohol. Dr. Wood reassured Hill that 80% of patients with her illness regain function. (*Id.*)

On examination, Hill's mood was euthymic and her affect was congruent, pleasant, and full. She had only peripheral thoughts of suicide. Her craving for alcohol was suppressed. "Her attention and concentration are excellent and cognition is back intact. Her full cognitive function appears to be reassembled." (*Id.*)

On June 5, 2009, Hill  reported that having the "correct medications" was a big step forward, but she felt that she needed to work very hard with her therapist if she was to continue to make progress. Hill was excited about a trip to Texas by airplane but worried about riding back by automobile with her mother and aunt.  (*PageID* 652.)

Dr. Wood's office notes from June 5 state that Hill was drinking a gallon of vodka a week. Dr. Wood said Hill suffered from severe bipolar depression that was cognitively disabling. She was a severe suicide risk. Dr. Wood was seeing her every four weeks, and she was seeing a therapist frequently. She got a medication box every two weeks. Her boyfriend was less abusive but "quite difficult and also rather dramatic." (*PageID* 91.)

On examination, Hill's mood was moderately depressed. Her affect was congruent and reactive. She continued to have suicidal ideation but no plan, "which is also an enormous step forward." (*Id.*) Dr. Wood prescribed Naltrexone to help reduce alcohol consumption. (*Id.*)

16

On July 23, 2009, Davidson counseled Hill about her relationship problems with her boyfriend. Her mood was irritable and dysphoric, but she was cooperative. (*PageID* 595.)

Dr. Wood's office notes for July 23 state that Hill said she had been sober since April 28. She was not suicidal. She felt a lot better because her mother and her aunt had helped her keep her house. But she was back with her boyfriend, who continued to drink.

On examination, Hill's mood was euthymic and her affect intact. She was sleeping alright. She was "a little hypersomnolent during the day and slowed up in terms of mentation." (*PageID* 626.) Dr. Wood thought it likely that Seroquel was sedating her a little during the morning. (*Id.*)

Dr. Wood's impression was "complete loss of function over the last four or five months," due to bipolar disease combined with a new onset of alcohol dependence. He believed that her "bipolar loss of function occurred then the drinking accelerated and the dependence occurred slightly after that so one followed the other." Hill was to return in eight weeks. (*Id.*)

On August 3, 2009, Kathleen Davidson's notes indicate Hill was euthymic. Davidson counseled Hill regarding her relationships with her daughter and boyfriend and suggested strategies for improving the relationships. (*PageID* 555.)

An "Exit/Termination Summary" report was prepared on August 17, 2009, noting that plaintiff's last contact was June 6, 2009 but stating that she was remaining in

the counseling and medication programs. Under comments, plaintiff's boyfriend had moved in to help with finances. They were attending couples counseling. She drove herself to appointments. Hill was making extra money to pay bills by babysitting and housecleaning. (*PageID* 648.)

On August 19, 2010, Six County notes state that Hill returned after having failed to return phone calls or respond to the exit letter. She no longer had a home phone or a cell phone. The case worker suggested Hill leave a message at the front desk every two weeks. She was in danger of losing her house, but recently her mother and aunt made her house payment and helped her catch up on bills. During the contact, Hill was very nervous and said that things in her life were back to being depressing and sad. Her boyfriend was back with her, but they had trust issues. (*PageID* 650.)

Dr. Wood's notes from September 18, 2009 state that Hill was then moderately depressed. Her family history included mental illness and alcoholism. In the last eight weeks, she had been reducing her drinking. Her mentation was "hopeless and helpless and that is a bad thing for this patient." (*PageID* 624.) Dr. Wood wanted to prescribe Lamictal, but it was hard to get Hill started on the medication because she had no insurance and was not receiving Medicaid. (*PageID* 625.)

On October 9, 2010, Six County notes state that Hill was worried that working to work off food stamps would have a negative affect on her Social Security disability case. Her anger about being required to work made it difficult for her to maintain attention and concentrate on her conversation with the case worker. She remained in couples

18

counseling but was having difficulty forgetting or letting go of the past to move on in the relationship. *(PageID 649.)*

Dr. Wood's office notes from a November 13, 2009 examination state that Hill's mood was euthymic. Her affect was congruent and full. She did not have thoughts of suicide. Her speech was mildly pressured. The plan was to increase her Lamictal dosage from the current 75 mg. to 200-300 mg. He indicated that although her current condition was good, "she could relapse very quickly." Hill was said to be suffering from a "devastating Bipolar illness." (*PageID* 623.)

Dr. Wood's office notes for November 30, 2009 state that a nurse  reported that Hill's thinking is excessively slowed with the increased dosage of Lamictal to 25 mg. three times a day. Dr. Wood wanted to see if the Lithium level in her blood was too high. On examination, her concentration and memory were intact. There appeared to be a little sedation. She was euthymic. (*PageID* 608.)

On May 5, 2010, Ms. Davidson completed a Mental Residual Functional Capacity assessment on plaintiff's behalf.  (*PageID* 719-21.)  According to Ms. Davidson, Hill was markedly limited in her of ability to maintain attention and concentration for more than brief periods of time.  (*PageID* 720.)  Ms. Davidson opined that Hill would be moderately limited in her abilities to:  accept instruction from or respond appropriately to criticism from supervisors or superiors; perform and complete work tasks in a normal work day or week at a consistent pace; process subjective information accurately and to use appropriate judgment; carry through instructions and complete

tasks independently; respond appropriately to changes in work setting; behave predictably, reliably and in an emotionally stable manner; and tolerate customary work pressures.  (*PageID* 719-21.)  Ms. Davidson found that plaintiff was only mildly impaired in her abilities to: work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; respond appropriately to co-workers or peers; relate to the general public and maintain socially appropriate behavior; work in cooperation with or in proximity to others without being distracted by them; perform at production levels expected by most employers; remember locations, workday procedures and instructions; and be aware of normal hazards and take necessary precautions.  (*Id.*)  Ms. Davidson concluded that historically, plaintiff demonstrated increased depression and mood swings in response to stress. (*PageID* 721.)

    **Administrative Law Judge's Findings.**  The administrative law judge found that:

1.    The claimant met the special earnings requirements of the Act on February 15, 2007, the date she says she became unable to work, and continues to meet those requirements through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since February 15, 2007 (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: bipolar affective disorder and a history of substance abuse in remission (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR

part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she needs to work in a static environment, with few changes in routine. She can perform repetitive tasks. The work cannot involve more than superficial contact with others. The work cannot involve strict time/production standards. The claimant cannot maintain attention/concentration for more than two hours at one time.

6.     The claimant cannot perform her past relevant work (20 CFR 404.1565).

7.     The claimant was born on July 21, 1957 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and can communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 15, 2007, through the date of this decision (20 CFR 404.1520(g)).

(*Page ID* 51-60.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings

21

of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla." *Id. LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "take into account whatever in the record fairly detracts from its weight." *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Plaintiff contends that the administrative law judge erred by discounting the weight assigned to plaintiff's treating psychiatrists, Dr. Corner and Dr. Wood, and giving great weight to the state agency reviewer, Dr. Hoyle, who reviewed only part of the record. Plaintiff also argues that the administrative law judge further failed to consider or analyze the opinion of plaintiff's therapist, Ms. Davidson, under SSR 06-3p. Plaintiff also contends that the administrative law judge based his residual functional capacity on an improper hypothetical unsupported by substantial evidence.

**Analysis.**

Treating Doctor: Legal Standard.  A treating doctor's opinion[3] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[3]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimus. Wilson*, 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id. See, Gayheart v. Commissioner of Social Security*, __ F.3d ____, _____, 2013 WL 896255, *14 (6th Cir. March 12, 2013).

inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson,* 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano,* 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[4].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1).  When a treating source's

---

[4]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

When the treating source's opinion is well-supported by objective medical evidence and is not inconsistent with other substantial evidence, that ends the analysis. 20 C.F.R. § 404.1527(c)(2); Social Security Ruling 96-2p[5]. *Gayheart v. Commissioner of Social Security,* __ F.3d ____, _____, 2013 WL 896255, *9 and *10 (6th Cir. March 12, 2013). The Commissioner's regulations require decision-makers "to provide 'good reasons' for discounting the weight given to a treating-source opinion. [20 C.F.R.] § 404.1527(c)(2)."[6] *Gayheart,* above, __ F.3d at _____, 2013 WL 896255, *9.

The Commissioner has issued a policy statement, Social Security Ruling 92-6p, to guide decision-makers' assessment of treating-source opinion. It emphasizes:

1.  A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.,* opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

---

[5]Social Security Ruling 96-2p provides, in relevant part:

. . .

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.,* it must be adopted.

[6]Section 404.1527(c)(2) provides, in relevant part: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

3.      Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4.      Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5.      The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6.      If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7.      A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

The focus at this step is solely on whether the treating-source opinion is well-supported by objective medical evidence and not inconsistent with other substantial evidence. In making this determination the factors for assessing the *weight* to give to the medical opinions of any medical source, 20 C.F.R. § 404.1527(c), are not used. These come into play only when there are good reasons not to give the treating-source opinion

controlling weight.  20 C.F.R. § 404.1527(c)(2)[7]; *Gayheart,* above, __ F.3d at _____, 2013 WL 896255, *10.

If there are good reasons to find that the treating-source opinion is not control-ling, then the decision-maker turns to evaluating all the medical source evidence and determining what weight to assign to each source, including the treating sources[8]. The Commissioner's regulations require the decision-maker to considers the length of the relationship and frequency of examination; nature and extent of the treatment

---

[7]Section 404.1527(c)(2) provides, in relevant part:

 If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. *When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion*

(Emphasis added.)

[8]Even when the treating source-opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and labora-tory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weigh-ed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  20 C.F.R. § 404.1527(c)(1) through (6). Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e).

The case law is consistent with the principals set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis."  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them."  *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004).  Even when the Commissioner determines not to give a treartor's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2).  *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The

28

Commissioner makes the final decision on the ultimate issue of disability.  *Warner v.
Commissioner of Social Security*, 375 F.3d at 390;  *Walker v. Secretary of Health & Human
Services*, 980 F.2d 1066, 1070 (6th Cir. 1992);  *Duncan v. Secretary of Health and Human
Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v.
Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion.

The administrative law judge believed that many of Hill's problems were related

to her drug abuse:

> The claimant has received treatment for multiple complaints, including
> emotional problems and substance use; however, the record indicates that
> such treatment has largely been conservative and non-aggressive. Indeed,
> the record suggests that many of her problems are secondary to her
> substance use. There is no reference to appropriate treatment for her
> substance abuse, as the only reference to AA meetings was in the past. She
> reported using medications, but denied any side effects other than weight
> gain, mental slowing, and losing her hair. However, it does not appear
> that any of these are work-preclusive. She testified that the medications
> are helpful.
> . . .
> [Hill] was less than diligent about working on her substance abuse, which
> now does appear to be in possible remission. However, for at least part of
> this time the claimant was not receptive to going to AA meetings and was
> not interested in taking any medication that would stop her from drinking
> (Exhibit 21F). As recently as May 4, 2009, the claimant witnesses drinking
> a gallon of vodka a week (Exhibit 21F/63).
>
> "In alcoholism disability cases, an important question is whether to
> claimant has lost the voluntary ability to control his use of alcohol." *Gerst
> v. Secretary of HHS*, 709 F.2d 1075, 1078 (6th Cir. 1983). Where medical
> evidence demonstrates that the claimant's alcoholism is not so deep-
> seated as to be irremediable, and that the only bar to his recovery is lack of
> motivation, the claimant will not be considered disabled. . . . Disability
> benefits thus are not appropriate where an alcoholic is not functionally

29

> impaired or can voluntarily control his abuse to the extent that he is not
> impaired. Here, the record fails to show that the claimant has maintained
> a wide range of daily functioning notwithstanding her substance use. *See*
> Exhibit 5F.

(*PageID 56-57.*) In any event, the administrative law judge found that plaintiff's "level of

daily functioning is greater than what she reported," which "indicates that she can

understand and follow instructions, perform routine tasks, interact with others on at

least a superficial basis, and maintain attention and concentration for simple tasks."

(*PageID 57.*)

The administrative law judge gave great weight to the opinions of the non-

examining agency reviewers and little to the opinions of Drs. Corner and Wood:

> . . . I assign great weight to the state agency evaluation. Those sources
> found the claimant capable of performing repetitive tasks in an environ-
> ment that is relatively static and requires only brief and superficial contact
> with others (Exhibit 7F/3). Social Security Ruling 96-6p provides that state
> agency source statements must be considered, as those sources are experts
> in the disability program. Great weight is given here, as these assessments
> are consistent with and well supported by the evidence as a whole.
>
> . . .
>
>  In contrast, Dr. Wood opined that the claimant is disabled from work
> (Exhibit 11F). I find this statement imprecise and that it addresses an area
> reserved to the Commissioner of Social Security (Social Security Ruling
> 96-5p). It is not accompanied by a function-by-function analysis. While Dr.
> Wood treats the claimant at the local mental health center, and is consider-
> ed as a treating source within the meaning of 20 C.F.R. § 404.1527 and
> Social Security Ruling 96-2p, I find that his report is not well supported by
> and consistent with the evidence as a whole. In particular, I note this
> conclusion is inconsistent with the state agency assessments (Exhibits 7F
> and 8F), the intake assessment at Six County (Exhibit 3F), the consultative
> examination by Mr. Loomis (Exhibit 5F), and the functional assessment
> from the counselor (Exhibit 25F).

> I give some weight to the assessment from six County, Inc., concerning the claimant's mental limitations, which is generally in accord with the residual functional capacity finding (Exhibit 25F). . . .
>
> Finally, I assign very little weight to the assessment from Dr. Corner at Exhibit 14F. That assessment, completed for the Ohio Department of Jobs and Family Services, identified multiple "marked" limitations. However, the report is not associated with corroborating mental status examination findings. Indeed, this source also noted that the claimant's use of alcohol had increased (*Id.* p. 5). The report is not consistent with the preponderance of the medical evidence.

(*PageID 5758.*)

The administrative law judge did not err in his consideration of Dr. Corner's opinions. Dr. Corner did not explain his opinions in any meaningful detail. His office notes do not corroborate the limitations stated in his opinion. For the most part they state that Hill was "doing OK." Further, the administrative law judge had Dr. Hoyle's residual functional capacity assessment that was based on the medical records from Dr. Corner and the one-time consultative evaluation by Mr. Loomis, which support his decision to discount Dr. Corner's opinion.

Plaintiff also argues that the administrative law judge failed to provide an adequate rationale for rejecting Dr. Wood's opinion. Although the administrative law judge cited Dr. Hoyle's residual functional capacity assessment as a basis for rejecting Dr. Wood's opinion, Dr. Hoyle, who made the assessment in April 2008, did not have the Six County treatment records because Hill did not start going there until July 2008. Similarly, Mr. Loomis's one-time disability evaluation examination and report sheds no light on Hill's psychiatric limitations during the period she was treated at Six County.

31

The administrative law judge's criticism that Dr. Wood's assessment "is not accompanied by a function-by-function analysis is not consistent with the Commissioner's regulations. An administrative law judge must give good reasons for rejecting the opinion of a treating psychiatrist. Initially, that analysis is limited to whether the opinion is supported by objective evidence and whether it is consistent with other credible evidence. The only evidence from the Six County treatment period is from Dr. Wood and Ms. Davidson. Dr. Wood's treatment notes demonstrate that he was concerned about Hill's suicide risk and that he documented the effects of her psychiatric illness on her ability to function. A perceived deficiency in the way he  reported his residual functional capacity assessment is not, standing alone, a good reason to reject his opinion. If the Commissioner wanted additional information from Dr. Wood, the administrative law judge should have asked the doctor to fill out a residual functional capacity assessment form and provide the wanted information. *O'Donnell v. Barnhard,* 318 F.3d 811, 818 (6th Cir. 2003). See, 20 C.F.R. § 404.1519h (a treating source is ordinarily the preferred source for additional information about a medical condition).

The administrative law judge also conflated his analysis of whether plaintiff was disabled with whether alcohol played a role in the disability. The first task is determine whether the claimant is disabled. Only then should the administrative law judge proceed to consider what role alcoholism plays in the disability. *Gayheart v. Commissioner of Social Security,* above at *15.

32

For these reasons, I conclude that this case should be remanded to the Commissioner for further proceedings to evaluate Dr. Wood's opinion on the limitations caused by plaintiff's psychiatric impairments consistent with the regulations for evaluating a treator's opinion as explained in *Gayheart*, above.

Treating source opinion from a therapist who is not an "acceptable medical source." Plaintiff next argues that the administrative law judge "completely neglected the requirement to consider SSR 06-3p while examining the opinion of Ms. Davidson, plaintiff's treating therapist.

Although the administrative law judge said he gave some weight to Ms. Davidson's assessment, he went on to state:

> . . . I note, however, that this assessment was not completed by an acceptable medical source. Therapist opinions are not entitled to controlling weight under Social Security Ruling 96-2p, nor are they treated as "medical opinions." . . . .
>
> Therapist opinions are not "opinions" of a "medical source," as defined in 29 C.F.R. § 404.1501, 404.1527.(a)(2), 416.902 and 416.927(a)(2), nor are they those of an "acceptable medical source," as defined in 20 C.F.R. § 404.1513 and 416.913.  Because a therapist does not qualify under either of these definitions, their opinions are, pursuant to 20 C.F.R. § 404.1527 and 416.927, not "medical opinions." Given this, a therapist's opinion is considered only to the extent that it helps understand how an impairment affects the ability to work. *See* 20 C.F.R. § 404.1514(e) and 416.913(e). As a result, such an opinion is viewed in the same manner as "information from other sources", including observations of non-medical sources, naturopaths, and social welfare agencies.
>
> Here, the therapist's analysis is generally consistent with the record as a whole, except for the "marked" limitation noted on maintaining attention and concentration for more than brief periods (Exhibit 25F). Such conclusion is specifically belied by the claimant's performance on mental status

examination by Mr. Loomis, who noted that this ability witnesses well
above average (Exhibit 5F).

(*PageID 58.*)

Therapists such as Ms. Davidson are not "acceptable medical sources" for

purposes of 20 C.F.R. 404.1513(a).  Nevertheless, 404.1513(d) mandates that "[i]n

addition to evidence from [acceptable /medical sources]... we may also use evidence

from other sources to show the severity of your impairments and how it affects your

ability to work." Under SSR 06-3p, only "acceptable medical sources" can give medical

opinions or provide evidence to establish the existence of a medically determinable

impairment.  However, therapists qualify as "other sources", and "information from

such 'other sources' may be based on special knowledge of the individual and may

provide insight into the severity of the impairment(s) and how it affects the individual's

ability to function."

A therapist working for a mental health care provider is not an acceptable

medical source.  20 C.F.R. § 404.1513(a).  Nonetheless, the Commissioner will consider

evidence from other sources "to show the severity of your impairment(s) and how it

affects your ability to work." 20 C.F.R. § 404.1513(d).  Social Security Ruling 06-03p,

2006 WL 2329939, provides that the same factors used to evaluate the opinions of

"acceptable medical sources," see 20 C.F.R. §§ 404.1427(d) and 416.927(d), "can be

applied to opinion evidence from 'other sources.'" See, *Gayheart v. Commissioner of Social*

34

*Security*, __ F.3d ____, _____, 2013 WL 896255, *14 (6th Cir. March 12, 2013). Those

factors include:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s), and
- Any other factors that tend to support or refute the opinion.

SSR 06-03p. These factors "represent basic principles that apply to the consideration of

all opinions from medical sources . . . who have seen the individual in their professional

capacity." *Id.*

On remand, the administrative law judge should evaluate Ms. Davidson's treat-

ment notes and her residual functional capacity assessment in the manner set out above.

Having found grounds for remand related to the administrative law judge's

residual functional capacity findings, I will not address the alleged error regarding the

hypothetical the administrative law judge addressed to the vocational expert.

From a review of the record as a whole, I conclude that there is not substantial

evidence supporting the administrative law judge's decision rejecting the opinion of Dr.

Wood that plaintiff is disabled. Accordingly, it is **RECOMMENDED** that this case be

**REMANDED** to the Commissioner of Social Security for further consideration of the

evidence from Six County and Dr. Wood's opinion that plaintiff is disabled**.  It is

FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be

**GRANTED** to the extent that it may seek remand, and that defendant's motion for summary judgment be **DENIED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Magistrate Judge, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b),

Fed. r. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge